[Crim. No. 424.  Third Appellate District.—February 20, 1918.]

THE PEOPLE, Respondent, v. CHARLES LEE, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE—ANONYMOUS LOVE LETTER.—In a
    prosecution for murder, the admission in evidence, for the purpose
    of showing motive for the crime, of a letter claimed to have been
    intended for defendant and opened by his mother-in-law, showing
    the existence of improper relations between the sender and the in-
    tended recipient, was prejudicial error, in the absence of any proof
    as to the author of the letter, or of any evidence connecting defend-
    ant therewith, who was not shown to have known of its existence
    until the trial.

ID.—CONVICTION OF MANSLAUGHTER — ERRONEOUS SENTENCE.—Under
    section 1168 of the Penal Code, providing for indeterminate sen-
    tences, a sentence upon conviction of manslaughter to imprison-
    ment for the term of from one to ten years is erroneous, in view of
    séction 193 of such code, fixing a maximum imprisonment for such
    offense of ten years, but fixing no minimum term.

APPEAL from a judgment of the Superior Court of
Mendocino County, and from an order denying a new trial.
J. Q. White, Judge.

The facts are stated in the opinion of the court.

W. D. L. Held, for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy
Attorney-General, for Respondent.

HART, J.—By an information filed by the district attor-
ney of Mendocino County, defendant was charged with the
crime of murder, committed on the sixteenth day of May,
1917, the deceased being his sister, Mary Long.  The jury
returned a verdict of manslaughter and the judgment of the
court was that the defendant "be punished by imprisonment
in the state prison of the state of California for the term of
from one to ten years."  The defendant appeals from an
order denying his motion for a new trial and from the
judgment.

Briefly but generally stated, the facts leading up to the
commission of the homicide are as follows: Defendant and
his wife were living in the town of Willits, in Mendocino

County. On May 14, 1917, Mrs. Ed. Gravier, who lived in Round Valley, accompanied by her daughter, Hazel, went to Willits for the purpose of visiting Mrs. Lee, the wife of defendant, who was also a daughter of Mrs. Gravier. The visitors were met at the train by Mrs. Lee and the three parties started for the defendant's house. On the way they stopped at the postoffice and Mrs. Lee went in to inquire for mail. When she came out she handed to Mrs. Gravier a letter addressed to Arlow Gravier, a son of Mrs. Gravier, who at the time was of the age of about nineteen years. The envelope, by the dating stamp, showed that it had been mailed at "Dos R." (an abbreviation for Dos Rios) on May 12, 1917. Mrs. Gravier opened and read the letter. It commenced with the words "Dear Charley," showed a considerable degree of friendship existing between the writer and the one for whom it was intended, and was signed "Sincerely yours, Billy."

On the next morning, May 15th, there was some conversation between Mrs. Gravier and defendant about the receipt by the latter of "love letters," defendant stating that he never received any and Mrs. Gravier replying, "Don't be too sure." She stated that the conversation was "just in a joking way" and that she did not show defendant the letter above referred to, which was in her possession at the time, nor did she tell him that she had such a letter.

During the night of May 15th defendant was with several men in a saloon at Willits. Frank Hall, one of these men, testified that defendant told him that his wife "had got a letter that some person had wrote to him and he never got," that his mother-in-law was making trouble between him and his wife and "he would make trouble if they didn't leave him alone." Defendant started for his home between 2 and 3 o'clock in the morning. He stopped at the home of Mr. and Mrs. Long, who were in bed, and, according to the testimony of Mr. Long, said "that he would go home and show that damned old mother-in-law of his how to interfere with his business." Defendant went out and, shortly afterward, Mrs. Gravier and her daughter, Hazel, went to the Long house. Mrs. Gravier there said that "Charlie had the gun and was going to do some killing over there, going to kill the family." Mrs. Long partially dressed herself and went to the defendant's house. Ten or fifteen minutes later, some-

where between 4 and 5 o'clock in the morning, Mr. Long heard shots at the Lee residence.

Mrs. Daisy Moore, who was in a house across the street from the Lee residence, heard screaming and saw two women and two children running from the house. She said that Mrs. Long came out of her house and said, "I am going over there and put a stop to that right now," and went to Mr. Lee's. Mrs. Moore testified: "Before ever I heard the shooting I heard a man's voice say, 'You will open my letters, will you?' Q. And could you recognize the voice? A. Well, it sounded very much like Mr. Lee's voice; I had heard his voice before and it sounded very much like Mr. Lee's voice; I am quite sure it was his." Other witnesses—neighbors of the Lees—testified that they heard some one of the children cry out several times, "Don't shoot, papa."

1. The point mainly relied upon by the defendant is that the letter referred to was erroneously admitted in evidence; that, while the district attorney, in his opening statement to the jury, stated that the letter came to defendant from a Mrs. Spencil, there is no evidence in the record as to who wrote it or that it was intended for the defendant; that, if the jury believed the letter to have been intended for defendant, and sent by a woman not his wife, its contents were highly prejudicial to defendant's case, and that the district attorney read and re-read to the jury the contents of the letter and drew "every sinister conclusion from its contents that might work to the detriment of defendant."

In view of section 4½ of article VI of the constitution, which authorizes the excuse of errors in the trial of cases where, after a review and consideration of the entire record of the case in hand, it cannot be said that a miscarriage of justice has resulted from any error so committed, it is requisite that the testimony should be examined and considered to determine whether the letter referred to was prejudicial, assuming for the present that it was inadmissible.

As to what occurred in the house immediately after the defendant entered it on the morning of the shooting, the testimony of Mrs. Gravier, Mrs. Lee, and Miss Hazel Gravier, who afterward became and was at the time of the trial the wife of one Hart, shows these facts: That the defendant, upon entering the house, first went into the room occupied by Mrs. Gravier and her daughter, Hazel, and, lighting a

lamp, remarked to them that he thought it was time for them to arise. He then went into the room occupied by his wife and one of the children and made a similar suggestion to them. He then took down a revolver which was hanging from the wall in the room. Mrs. Lee, addressing him, asked him in rather a loud tone of voice to give the weapon to her. Whether he voluntarily delivered the weapon to her or she by force got it from his possession does not clearly appear from the evidence, but at all events she obtained possession of the weapon. Lee then left the room and went to the home of his sister, Mrs. Long, the deceased. In the meantime, one Packard, who had been out all the night before with Lee, and on the morning of the shooting accompanied the latter to his home, entered the room of Mrs. Lee. Upon observing Packard in the room, Mrs. Lee screamed and ordered Packard to leave the room. The defendant shortly thereafter returned, entered the house and in the kitchen procured a rifle which was kept there, and with it went into his wife's room. Mrs. Lee then hastily left the house. Mrs. Gravier stepped from her room into the sitting-room and saw the barrel of the rifle pointing toward her through the curtains from Mrs. Lee's room. She could not then see the defendant. She and her daughter, Hazel, thereupon left the house, went to Mrs. Long's residence and Mr. Long testified, as we have seen, she told the Longs that Lee "was going to kill the whole family." Mrs. Gravier, however, testified that what she said to the Longs was that Lee had taken the gun from the wall and that she (Mrs. Gravier) was afraid that he was going to commit suicide.

We have already shown that Mrs. Long, immediately upon being told by Mrs. Gravier of the trouble at the Lee home, went to the latter place. The defendant, his daughters, Annie and Francis, the former thirteen and the latter about five years of age, one Louis Muir, and Mrs. Long were then the only persons in the house. Annie did not appear to know how the shooting occurred and her testimony as to that circumstance seems to have been of an evasive character, due, probably, to a desire to shield her father as much as possible at the trial, or perhaps it may have been the result of poor memory, as she intimated was the fact. At any rate, she said she saw no scuffling between her father and Mrs. Long prior to the discharge of the rifle. She said that her

aunt and baby sister were standing near the door leading into the room and her father held the rifle so that the muzzle pointed toward the floor, and that while so holding the weapon it was discharged.

Muir testified that he had, before the defendant entered the house, asked the latter for the loan of a pistol. He was waiting on the outside for the return of Lee when he heard some noise in the house and met Mrs. Lee as she was leaving the house. The latter said to him: "Look out—Charley [referring to the defendant] has gone crazy—going to shoot somebody." Thereupon Muir entered the house and went into the room where Lee and Mrs. Long were, he said, wrestling with a rifle, each apparently endeavoring to take the weapon from the other. During the scuffle the rifle was discharged, he said, and Mrs. Long fell to the floor. Lee, addressing Mrs. Long, asked: "My God, have I shot you?" and she replied that he had, whereupon, addressing Muir, Lee said: "My God, Louie, I have shot my sister—go and get a doctor." Muir immediately started out to find a physician.

Lee testified that his purpose in getting the pistol was to loan it to Muir; that, when he took it from the wall his wife requested him to give it to her and that he did so; that thereafter he told Muir that his wife refused to let him have the pistol and that Muir said that he desired the weapon for the purpose of shooting some wild animals infesting that section and insisted upon Lee loaning him a weapon; that he (Lee) then returned to the house and procured the rifle, which was then unloaded, and went into his wife's room to procure some cartridges which he kept in a bureau drawer in that room; that his sister, Mrs. Long, then came in the house and into the room where he was and, taking hold of the gun and addressing Lee, said: "Oh, Charlie, don't do that," "and," continued Lee, "I did not know what she meant by the remark she made and I says, 'Do what, Mary?' I says, 'I ain't going to hurt nobody,' and she let loose of the gun; these cartridges—then I had took out ten cartridges out of the box and put the rest back in the bureau drawer, and so when she came in and grabbed hold of me with the gun my baby then grabbed me by the leg and she hollered or something, I don't know what she did say. I couldn't swear positive what she did say; so I seen she was excited and I picked her up and walked over and put her down

on the bed; and my sister let loose of the gun. She was as calm as anyone was then; she cooled off right away and we set there and talked a few minutes—I guess three or four minutes. I was playing with the baby, and I got up and went back over and Louie Muir was standing in the door and I picked up these cartridges and I pulled back the breech-block to that gun and put in five cartridges; my sister was over at the bed and the baby when I left there. When I put those cartridges in I just turned around and let this breech-block down and when I did it went off. My sister and baby must have moved over next to the door during the time my back was turned, because I never did see them until that shot was fired. When the shot went off, my sister says, 'Oh, Charlie,' and she kind of slid down the wall and my baby run out to one side and exclaimed, 'Oh, papa.' . . . I dropped this gun against the wall and went over and grabbed my sister before she fell to the floor. She was kind of sliding down the wall, and so Louie Muir was there and I says: 'My God, I have shot my sister—run for a doctor'— and so he left. . . . After Muir left my sister asked for water—said she felt sick, and I ran out to the kitchen and procured and brought to her some water.'' With the assistance of Packard, above spoken of, who was in an outhouse on the Lee premises when the shot was fired, the defendant placed Mrs. Long on a bed.

As to the conversation with his companions with whom he was drinking and carousing before going to his home, the defendant denied that therein he made any threat against either his mother-in-law or his wife, or that he referred to any particular letter. One of his companions testified that, while he inferred from his conversation that the defendant was referring to his mother-in-law when speaking of his letters being tampered with, he did not mention that lady's name. The same witness testified that, in said conversation, the defendant referred only to a letter which he claimed his wife had surreptitiously "taken from his clothes."

With respect to the letter admitted in evidence, the defendant testified that he had never heard of or seen it until it was produced at the trial. Mrs. Gravier testified that she had never shown him the letter or referred to it in his presence except in the general and jocular way above referred to.

There was no testimony presented showing or tending to
show that the defendant and Mrs. Long had ever had any
differences, or that the defendant had ever threatened to
inflict injury upon her. To the contrary, the defendant tes-
tified that there had always been the best of feeling existing
between them.

It should be stated that two flesh wounds were produced
by the cartridge from the rifle upon the left lower limb of
Mrs. Long—one in the thigh and the other in the calf of the
leg; that the wounds were temporarily treated by a local
physician, after which she was removed to the county hos-
pital, at Ukiah, where she received treatment by the county
physician; that her death was due to an infection which de-
veloped in the wounds and caused decomposition to set in.

Mrs. Long, shortly after being shot, stated to several per-
sons that she believed she would not recover, and on the
day she was removed to Ukiah declared that she never would
return alive. On all these occasions she declared that the
shooting was purely accidental, and a few days before her
death, after stating that she knew she was going to die, she
signed the following paper, which was read to her, one of the
witnesses testified, and which she herself read, so another wit-
ness declared:

"Mrs. Mary Long being first duly sworn, deposes and says
that she resides at Willits in the county of Mendocino, Cali-
fornia; that she knows Charles Lee and has known him at
all the times herein mentioned; that on Wednesday morn-
ing, May 16, 1917, at about the hour of about 15 to 5 o'clock
she was present at the home of said Charles Lee in said
Willits and said Lee at said time had in his hand a gun and
threatened to commit suicide; that affiant endeavored to dis-
suade him from his express purpose and that she grabbed
said weapon and a struggle ensued between herself and said
Lee; that in said struggle said gun was discharged twice
striking affiant in the leg above the knee; that at said time
Frankie Lee the daughter of said Charles Lee was hanging
about the knee of affiant and said weapon discharged one or
more bullets in the body of said child and of affiant. That
the discharge of said weapon was wholly and entirely acci-
dental and without any intention so far as was apparent to
affiant on the part of said Lee to discharge the same.

"(Signed) Mrs. MARY E. LONG, Affiant."

We have thus reproduced herein a brief synoptical statement of the testimony given both for and against the defendant, and it will not be denied that, upon the facts, the case is a very close one. In fact, so far as may be judged from the face value of the testimony, a verdict of acquittal would have been equally with the verdict returned consistent and reasonable. The testimony tending to show the ugly state of mind in which the defendant was prior to returning home, and that tending to establish that he had threatened to do physical violence to his mother-in-law, together with the testimony of the neighbors that they heard loud noises and other disturbances at the home of the defendant after he had returned thereto in the early morning, and the testimony that upon entering the house he procured a weapon, which was taken from him, and then procured the weapon with which the shooting was done and loaded it with cartridges, and other circumstances of a more or less incriminating character, might justly be held to be sufficient to sustain the verdict.

On the other hand, it is very plain from the testimony that had he desired to inflict any injury upon his wife or his mother-in-law, he could have done so, for the opportunity for such violence was present. His wife appeared to have little difficulty in getting the pistol from his possession, and his mother-in-law was still in the house when he had possession of the rifle. There is absolutely no testimony in the record, except the mere fact of the discharge of the rifle, from which it can be inferred that he intended to shoot or injure Mrs. Long. There is, indeed, no testimony except his explanatory of how the rifle came to be discharged and he did not seem to know precisely how it occurred. It is, therefore, impossible to say from the record that the shooting was the result of criminal negligence, which would constitute the offense that of manslaughter, and there is no evidence to support the theory, which was advanced by the district attorney in his opening statement to the jury, that the shooting of Mrs. Long, while not intended as to her, was the result of an attempt and an intent deliberately to shoot some other person.

Of course, the object of the foregoing discussion of the testimony is not to show that the verdict, so far as the evidence is concerned, could not be upheld. Thus we have considered and briefly analyzed the proofs only to show that,

as before stated, the verdict has exceedingly frail support, and that the ruling admitting the letter above referred to in evidence must be considered in view of that situation as to the testimony. To the consideration of said ruling we are now brought.

The letter in question is here given in full:

"May 11th 17

" 'Dear Charley'

"Just a few lines to let you know I haven't forgotten My Little Papa. I am just able to be up today & feel very weak. So please excuse this scrawl. How is every little thing & what is the latest news. How is Son? Remember me Kindly Your Rival is here with Hydrant..they are getting Hogs so you know I am in no condition for Company & do not Care to be bothered. But I had to get up just the same. They had to sleep out in the Tent & thought it a crime. Well I can not help it. I have only a small Cabin built for 2; Certain ones only are welcome. Well I hope this finds you O. K. & take good of yourself & don't hit the jug too much & you will feel better. Hope you answer this so I will know if it reached you without trouble. As you have had enough. And I don't want to cause you any more. Can't write you much as I am too weak Must go back to bed. So I must close with lots of love

"Sincerely Yours

" 'BILLY'

"Address c/o 'Idlewylde Ranch'

"Haven't seen Road house since Tuesday. Have a lot to tell U. Write soon.

"Do you know of any one has a good collie Puppy to give away. Just heard you had split the blankets. Is that true?"

We think that there was absolutely no legal foundation whatever laid for the admission of that letter in evidence. We search the record in vain to find that it was in any measure or degree connected with the defendant or that the defendant was connected with it. There is no evidence showing who wrote the letter, or whether the writer of it was a male or female, and if the latter whether it was written

by the party named by the district attorney as its author in his opening statement. It is true that, whereas the envelope containing the letter was addressed to "Arlow Gravier," the writer in the letter itself addressed the party for whom it was intended as "Charley," the first name of the defendant, and that Mrs. Gravier testified that her son, Arlow, was not known, or, so far as she knew, ever addressed as "Charley." It is also true that the defendant stated, on cross-examination, that he thought he recognized the handwriting of the letter, although declaring in the same connection that he knew no person known as or calling him or herself "Billy." But these circumstances fall far short of showing that the letter was intended for the defendant. It is not at all improbable, so far as the record goes, that the author of the letter and Arlow Gravier might have had an understanding between themselves that thus he or she, as the case is, should address his or her letters to him, or, so far as the record throws light upon the matter, it would not be an improbable theory that the writer of the letter was accustomed to addressing him as "Charley." In any event, there is not, as stated, any testimony of any character in the record showing that the letter was intended for the defendant. There might have been a suspicion in the minds of Mrs. Gravier and Mrs. Lee that the letter was intended for the defendant. There probably was, as we infer from what Mrs. Gravier said to the defendant after receiving the letter when jokingly speaking of whether he (defendant) had ever received love letters, she having testified that, while she had the letter in her pocket, he said he had never received love letters and she replied, jokingly, "not to be too sure about that." But even this does not connect the defendant with this particular letter. Furthermore, as has been shown, there is no testimony tending to show that the defendant had any knowledge of the existence of the letter in question until it was produced at the trial. On the contrary, the testimony of both Mrs. Gravier and himself shows that he had no such knowledge until the trial, and theirs is the only testimony in the record upon that proposition.

It follows that the letter was clearly inadmissible, and that it was highly prejudicial there can be little, if any, doubt.

Readily can it be understood how a jury of laymen—generally made up of the most intelligent and respectable citizens of a county—would bitterly resent the conduct of a man of family in maintaining such relations with a female not his wife, as the language of the letter in question as interpreted in the argument by the district attorney very clearly indicates existed between the writer of said letter and the person for whom it was intended. We think that it can be laid down as a proposition hardly admitting of dispute that, in a close case upon the facts, such a letter, where, as here, the defendant was a married man and has a family of young children, would move the scales against him. And that the jury in this case regarded the letter as having been written by a female and intended for the defendant, is undoubtedly true, since it was admitted in evidence avowedly upon that theory, and since, furthermore, the district attorney, both in his opening statement and closing argument, declared that the letter was written by some woman and intended for the defendant; and that the district attorney regarded the letter as a singularly important circumstance strongly supporting the theory of guilt, is also an unquestionable proposition, for he not only repeatedly referred to and laid emphasis upon the fact in his closing argument, but read and analyzed the language of the letter before the jury and so interpreted certain rather mysterious or ambiguous phrases thereof as to show that the letter was intended not for an unmarried but for a married man having domestic trouble, and drew the inference from the language, as he interpreted it, and declared that the letter could not have been intended for Arlow Gravier, an unmarried youth, but for the defendant.

The argument and the inferences referred to were, in our opinion, wholly unwarranted, and were so because, as before stated, there was no testimony, except such as might only have generated a mere suspicion, showing that the defendant was the party for whom the letter was intended.

Moreover, as the purpose of the introduction in evidence of any such letter was to show motive for the alleged crime of the accused, the letter in question was wholly out of place in this record, inasmuch as it was not shown that the defendant knew of its existence until the trial.

Our conclusion is that the error considered is beyond the saving grace of section 4½ of article VI of the constitution, and that for said error the cause must be reversed. But, in view of a probable retrial of the case, the following suggestions should be made: The judgment pronounced in this case is imprisonment in the state prison for from one to ten years. This judgment was undoubtedly pronounced in purported obedience to section 1168 of the Penal Code, added to said code by the legislature of 1917. (Stats. 1917, p. 665.) Said section expressly provides that the court, in imposing sentence, where the imprisonment is to be in any reformatory or state prison of the state, shall not fix the term or duration of the period of imprisonment, . . . *"provided,* that the period of such confinement shall not exceed the maximum or be less than the minimum term of imprisonment provided by law for the public offense of which such person was convicted."

The penalty for manslaughter, of which the defendant was convicted, is "imprisonment in the state prison not exceeding ten years." (Pen. Code, sec. 193.) It will be observed that the punishment may be for any term less than ten years; it may be for a month or even one day. The judgment in this case, therefore, although in our opinion not void, is, nevertheless, erroneous, inasmuch as it fixes a minimum penalty. Although not necessary to be decided here, it would seem from the language of the section that it was contemplated that a judgment of sentence should merely be that the defendant be confined in one of the state prisons, without fixing or naming either the minimum or maximum penalty for the offense of which he was convicted. Of course, these observations are ventured upon the assumption that the new section in question is consistent in all respects with the provisions of the constitution having a bearing upon the matter of penal junishment.

Judgment and order reversed and cause remanded.

Chipman, P. J., and Burnett, J., concurred.